**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 26, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

GARY WADE HARLOW, II,

    Defendant-Appellant.

No. 04-8074

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 03-CR-232-ABJ)**

---

L. Robert Murray, Assistant United States Attorney (Matthew H. Mead, United States Attorney, with him on the brief), Cheyenne, Wyoming, for Plaintiff-Appellee.

John M. Nicholson (Douglas C. McNabb with him on the briefs) of McNabb Associates, P.C., Houston, Texas, for Defendant-Appellant.

---

Before **O'BRIEN, ANDERSON** and **McCONNELL**, Circuit Judges.

---

**O'Brien**, Circuit Judge.

---

On November 20, 2003, Gary Wade Harlow, II, and Larry Parker were

indicted for conspiracy to possess and distribute more than 500 grams of methamphetamine under 21 U.S.C. § 841(a)(1) and (b)(1)(A). On December 30, 2003, Harlow pled not guilty. Parker subsequently entered into a plea agreement with the government, leaving Harlow as the sole defendant at trial. After a three-day jury trial, the jury returned a guilty verdict on April 7, 2004. On appeal, Harlow alleges the prosecutor impermissibly vouched for the credibility of key witnesses and the district court deprived him of his right to poll the jury. We exercise jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. Background

This case is the last in a series of trials based upon a methamphetamine distribution conspiracy in Gillette, Wyoming, known as the Wolverine Trenching Conspiracy. Harlow, an employee at Wolverine Trenching, was convicted of conspiracy to distribute more than 500 grams of methamphetamine based primarily on his involvement in a delivery of over one pound of methamphetamine from Gillette, Wyoming, to Buna, Texas. During Harlow's trial, the government called six witnesses to testify against him. Five of these witnesses were co-conspirators who had entered guilty pleas pursuant to agreements with the government: Jessie Janway, Rhett Flint, John Villa, Clinton Tullier and Larry Parker. Three of these witnesses, Janway, Flint and Villa, had already received sentence reductions for their background testimony in prior cases

involving the same underlying drug conspiracy.  During the examination of these three witnesses, the prosecutor introduced their plea agreements, referring to the agreements' cooperation and truthfulness provisions.  In addition, he introduced the government's Rule 35(b) motions recommending sentence reductions for these witnesses based on their prior testimony, and their sentence reduction orders signed by the Honorable Alan B. Johnson, the judge at Harlow's trial.  The evidence and testimony were received without objection from Harlow's trial counsel.

The relevant provisions of all three witnesses' plea agreements were identical.  So too was the prosecutor's examination of the witnesses when introducing the government's motions for a reduction in sentence and the district court's order granting the motion.  The prosecutor's exchange with Janway is typical:

> Q.     Okay.  7-A, that would be [a] motion to reduce your sentence correct?
>
> A.     Yes, sir.
>
> Q.     And the very last page, that would be Judge Johnson's order reducing your sentence; correct?
>
> A.     Yes, sir.
>
> . . .
>
> Q.     So you received –- today you've already received the benefit of your plea agreement; correct?

A. Yes, sir.

(R. at 135-36. *See also*, R. at 148-49, 164-65.) In the examination of the remaining co-conspirators, Tullier and Parker, the prosecutor again referred to the cooperation and truthfulness provisions when introducing their plea agreements, and discussed the possibility of a sentence reduction upon the government's recommendation without objection from Harlow's counsel.

During closing argument, Harlow's counsel returned to a theme developed in his opening argument and carried throughout his cross-examination of the co-conspirators. He argued that the prosecutor was relying on "snitch testimony, testimony that is essentially . . . purchased by the government in the form of time . . . less prison time." Harlow's counsel characterized the "snitch testimony" as "unreliable" and asserted that a witness "knows the score. [He] knows what he needs to do here in Wyoming to help himself out," and "[h]e only has to put a slight twist on his testimony to get the benefit here." (Appellee App. at 341, 343-44.)

In rebuttal, the prosecutor argued:

You know, the government always - it just doesn't matter. Any case where you call coconspirators to testify against the other coconspirators, we've suddenly hopped in bed with the defendants, the coconspirators, and we've hopped in bed with drug dealers. It's the law, ladies and gentlemen. Congress has a part in that process. [It passes] laws that allow the government to give breaks to cooperating coconspirator drug dealers. Separation of powers. It's

all here. Congress allows it to happen. The executive branch, representing the executive, we're involved. We use them as witnesses. But what's really important, and you can have a chance to take a look at this, you've got the orders reducing their sentences signed by the judicial branch, Judge Johnson.

(R. at 271; Appellee App. at 354.)

After closing arguments, the final instructions included the following credibility instruction:

> The testimony of an alleged accomplice or coconspirator or someone who said he or she participated with another person in the commission of a crime must be examined and weighed by the jury with greater care than the testimony of a witness who did not participate in the commission of a crime. Larry Parker, Clinton Tullier, John Villa, Jesse Janway, and Rhet Flint may be considered to be such witnesses in this case.
>
> The fact that an alleged accomplice or coconspirator has entered a plea of guilty to the offense is not evidence of the guilt of any other person, including the defendant, Gary Wade Harlow II. The Jury must determine whether the testimony of an accomplice or coconspirator has been affected by self-interest or by any agreement he may have with the United States . . . .
>
> . . .
>
> The testimony of a witness who provides evidence against a defendant for personal advantage, sentence reduction, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness . . . .

(Appellee App. at 357-58.)

Immediately after the trial court issued its instruction, Harlow's counsel approached the bench and moved for a mistrial or, in the alternative, a curative

instruction. He argued the government's closing argument "suggested that because [the trial court's] signature was on these [sentencing reduction orders] that somehow the [trial judge] was vouching for the credibility of these witnesses." (Appellee App. at 361.) The district court denied the motion for a mistrial but granted the request for a curative instruction. It gave the following instruction to the jury:

> There was reference made to me having signed an order approving a plea agreement by and between the parties. I'd explain to you that I review plea agreements and decide whether or not they violate any public policy as part of the duties that the judge has in every case. I don't vouch for the credibility of any of the witnesses who have appeared here before this court. That is your job. That is not my job. And I don't make that decision in a case. You're the ones who see the witnesses testify, consider their testimony and, under the instructions of the Court, are the judges of the facts and the weight and credibility of the witnesses.

(R. at 275; Appellee App. at 362.)

After approximately three hours, the jury rendered its guilty verdict. Prior to entering judgment, the district court stated: "Counsel, if you wish to examine the verdict, you should feel free to do so." (R. at 278.) Harlow's counsel did not respond.

The court proceeded to discuss the case with the jury, stating this trial brought an end to a case that had been pending for a long time and had consumed considerable court resources; The district court then commented on a personal conversation with Special Agent Hamilton (a government witness during the trial)

-6-

which revealed that over 168 children in Gillette, Wyoming, were implicated in the use of methamphetamine provided by the conspiracy involving Harlow and the terrible impact of methamphetamine on communities. The court also advised the jurors that they had rendered a public service on par with the jurors of several highly publicized cases. At the conclusion of the court's comments, Harlow's counsel finally requested a poll. When asked individually, each juror agreed with the verdict.

On July 1, 2004, Harlow was sentenced to 120 months imprisonment.[1] Judgment was entered on July 6, 2004. On July 23, 2004, Harlow filed a notice of appeal through new counsel.

## II. Discussion

On appeal, Harlow argues: (1) the prosecutor improperly vouched for the credibility of key witnesses and (2) the district court deprived him of his right to a

---

[1] On June 30, 2004, Harlow's trial counsel filed a motion for a new trial pursuant to Rule 33(b)(1) of the Federal Rules of Criminal Procedure based on newly discovered evidence. The motion also included defense counsel's request to withdraw and for the appointment of new counsel on appeal. The district court declined to hear Harlow's motion for a new trial at that time but asked defense counsel to submit a proposed order. Harlow's proposed order stated that the motion for a new trial should be denied. The district court signed the proposed order and granted defense counsel's motion to withdraw. In his opening brief, Harlow argued the district court erred by not ruling on his motion for a new trial based on newly discovered evidence. However, in his reply brief, Harlow concedes his trial counsel's proposed order prevented the district court from exercising its discretion and withdraws this argument on appeal.

jury poll.

## A. Vouching

Harlow contends the prosecutor's introduction of witnesses' plea agreements, Rule 35(b) motions and sentence reduction orders,[2] coupled with the prosecutor's statement in rebuttal closing argument implying that the judge had signed off on the credibility of these witnesses, constituted impermissible vouching.[3]

### 1. Introduction of Evidence

Because Harlow did not object to the admission of this evidence and testimony, we review for plain error. *United States v. Magallanez*, 408 F.3d 672, 679-80 (10th Cir.), *cert. denied*, 126 S.Ct. 468 (2005). "Plain error is *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *United States v. Henning,* 906 F.2d 1392,

---

[2]On appeal, Harlow does not challenge the introduction of the plea agreements, Rule 35(b) motions, or sentence reduction orders as an evidentiary matter under the Federal Rules of Evidence.

[3]The use of plea agreements and their truthfulness provisions on direct examination has also been challenged as a violation of the rule against bolstering credibility in Federal Rule of Evidence 608(a)(2). However, we have rejected such challenges. *See United States v. Lord*, 907 F.2d 1028, 1031 (10th Cir. 1990) ("it was not error for the trial court to allow the government, during its direct examination, to present evidence of the agreements between the government and the witnesses, including testimony concerning the truthfulness provisions contained in those agreements."). Harlow discusses the issue but does not raise it as a challenge to the proceedings below.

1397 (10th Cir.1990) (internal quotation omitted). Before we can correct an error not raised at trial, the defendant must establish: (1) error, (2) that is plain, and (3) that affects substantial rights. *Jones v. United States*, 527 U.S. 373, 389 (1999). If all three requirements are met, the defendant still must establish the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* In cases involving the defendant's failure to object, the defendant bears the burden of establishing the error impacted substantial rights by demonstrating the outcome of the trial would have been different but for the error. *United States v. McHorse*, 179 F.3d 889, 903 (10th Cir. 1999). Thus, when reviewing vouching for plain error, we weigh the seriousness of the vouching in light of the context of the entire proceeding, including the strength of any curative instructions and the closeness of the case. *United States v. Roberts*, 185 F.3d 1125, 1144 (10th Cir. 1999); *United States v. Swafford*, 766 F.2d 426, 428 (10th Cir. 1985).

a. Witnesses Janway, Flint and Villa

The prosecutor began the trial with the testimony of Janway, Flint and Villa. Prior to the direct examination of each witness, the prosecutor established that each had entered into a plea agreement related to the conspiracy in this case. He then had each testify to the fact each had received a reduction in their sentence based on their adherence to the agreement and that Judge Johnson, the trial judge

in this case, had signed an order approving the reduction. The prosecutor then introduced the plea agreements, the 35(b) motions requesting the reductions, and the order so granting. Harlow claims the admission of this testimony together with these documents constitutes impermissible vouching and, as such, is plain error.

It is error for the prosecution to personally vouch for the credibility of a witness. *United States v. Bowie,* 892 F.2d 1494, 1498 (10th Cir. 1990). Nonetheless, as Harlow concedes, it is perfectly permissible for a prosecutor to introduce a witness's plea agreement on direct examination, even if it includes a truthfulness provision. *Magallanez*, 408 F.3d at 680; *Lord*, 907 at 1031; *Bowie*, 892 F.2d at 1498-99. A prosecutor may also discuss the truthfulness provision and make sure the witness is aware of the consequences of failing to tell the truth. *Bowie*, 892 F.2d at 1499. This is intended to allow the prosecutor to head off claims that the witness' testimony is suspect due to the plea agreement. "Use of the 'truthfulness' portions of [plea] agreements becomes impermissible vouching only when the prosecutors explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness' testimony." *Id*. at 1498. Such independent verification can take the form of statements about polygraph tests or detective monitoring. *Id*.

Harlow argues that vouching occurred when the jury was given the

provisions of the plea agreement in conjunction with the evidence that the prosecutor moved for the benefits thereunder and the judge issued his approval. At that point, the jury could very reasonably infer that not only had these witnesses promised to tell the truth, but the prosecutor and the judge had verified their testimony via the motion and order—testimony consistent with their testimony at this trial.

"Argument or evidence is impermissible vouching . . . if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." *Id.* The relevant portions of the provisions in the plea agreements provided:

> 12(g). The Defendant agrees that if the United States determines, in its sole discretion, that he has not provided full and truthful cooperation . . . the plea agreement may be voided by the United States.
>
> . . .
>
> 13. The Defendant agrees that he is willing to provide substantial assistance in the investigation or prosecution of other persons who may have committed criminal offenses. The Defendant understands and agrees that a possible appropriate reduction of sentence . . . for such assistance shall be determined by the court. The Defendant agrees a possible sentence reduction can only occur upon the court's evaluation of the significance and usefulness of the Defendant's assistance, taking into consideration the government's evaluation of the assistance rendered, the truthfulness, completeness, and reliability of any information or any testimony provided by the

Defendant.

. . .

16(d). If the United States determines, in its sole discretion, that the Defendant has fully, completely, and truthfully cooperated with the Untied States, the United States agrees to recommend at the time of sentencing a downward departure . . . to reflect the Defendant's substantial assistance to the United States in this investigation by virtue of the information provided to authorities involved in this matter and due to his ongoing truthful testimony and truthful cooperation with law enforcement authorities.

(R. at 42-43, 45; 59-60, 62; 91-92, 94.)

Harlow argues that the introduction of section 12(g) constitutes vouching by allowing the jury to infer that the prosecutor had verified the witness' veracity prior to taking the stand in a prior case or else the government would have rescinded the plea agreement. While that is a possibility under 12(g), even if coupled with the introduction of the Rule 35(b) motions and the sentence reduction orders, the provision's language contains no explicit or implicit requirement that the prosecutor monitor or verify the truthfulness of the witness' testimony, it merely requires the witness to testify truthfully or else the agreement *may* be rescinded. One would hope a prosecutor had an expectation of truthfulness from every witness he called. Thus, verified truthfulness is not a precondition to the witness testifying, and the government does not assume the burden of monitoring for accuracy. As Harlow concedes, the government was not required to rescind the plea agreement if it learned the witness had not been

truthful. At most, the jury could infer that the witnesses' testimony was consistent with that of earlier related trials.

Sections 16(d) and 13 are more problematic. Section 16(d) clearly states the government will recommend a downward sentence departure if the witness "fully, completely, and truthfully" testifies and that the reduction will be "due to his *ongoing truthful testimony* and truthful cooperation with law enforcement authorities." This provision coupled with the introduction of the government's Rule 35(b) motion implies that the government has verified the truthfulness of the witness and believes that his ongoing testimony is truthful, which is why it made a motion for a sentence reduction. The jury could reasonably infer that the government would not have recommended such a downward departure if it had not independently verified the truthfulness of the testimony. This conclusion would be undermined if the government recommended a sentence reduction for testimony given in an unrelated event, but such is not the case here. The three witnesses were given sentence reductions in exchange for their testimony in a series of trials all relating to the same underlying methamphetamine drug conspiracy. The combination of section 16(d) with the introduction of the government's Rule 35(b) motions amounts to prosecutorial vouching.

Section 13 only compounds the matter. Not only does it reiterate the role of the government in recommending sentence reductions for truthful testimony, it

also implicates the judge in the verification process:

> The Defendant agrees *a possible sentence reduction can only occur upon the court's evaluation of the significance and usefulness of the Defendant's assistance*, taking into consideration the Government's evaluation of the assistance rendered, *the truthfulness, completeness, and reliability of any information or any testimony provided by the Defendant*.

(R. at 43, 60, 92 (emphasis added).) The provision makes clear that a sentence reduction occurs as a result of the district court's evaluation of the testimony based on factors such as the "truthfulness, completeness, and reliability" of the testimony. The award of a reduced sentence presented to the jury in the form of a sentence reduction order confirms that a judge has found the witness' testimony truthful. *See United States v. Rudberg*, 122 F.3d 1199, 1204-05 (9th Cir. 1997). The fact that the judge who authorized the sentence reduction is the same judge presiding at trial only underscores the problem. Therefore, we must conclude that it was error to allow the prosecutor to introduce the plea agreements in conjunction with the Rule 35(b) motions and the sentence reduction orders.

b. Witnesses Tullier and Parker

The prosecutor introduced Tullier and Parker's plea agreements into evidence and referred to the provisions therein regarding their obligation to cooperate with the government and testify truthfully at trial, as well as the consequences of violating the provisions. Here, however, the prosecutor did not introduce anything other than the plea agreement. This, by itself, is acceptable.

*See Magallanez*, 408 F.3d at 680 (approving discussion of the terms of plea agreements); *Lord*, 907 F.2d at 1031 (same); *Bowie*, 892 F.2d at 1498-99 (same) and *United States v. Dunn*, 841 F.2d 1026, 1030-31 (10th Cir. 1988) (approving admission of plea agreements into evidence); *United States v. Bey*, 188 F.3d 1, 7 (1st Cir. 1999) (same).

        c.  Plain Error

Although we conclude the introduction of sections 13 and 16(d) during the testimony of Janway, Flint and Villa, coupled with the introduction of the Rule 35(b) motions and the sentence reduction orders constitutes error, Harlow must further demonstrate the outcome of the trial would have been different but for the error.  A careful review of the transcript reveals he has failed to do so.

Because there was no error in the admission of the plea agreements with two of the main witnesses, Tullier and Parker, Harlow must establish a violation of his substantial rights stemming from the testimony of the three remaining co-conspirators.  "In determining whether the misconduct affected the outcome, we consider: 'the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole.'" *United States v. Lonedog*, 929 F.2d 568, 572 (10th Cir. 1991) (quoting *United States v. Martinez-Nava,* 838 F.2d 411, 416 (10th Cir. 1988)).  By Harlow's own admission, Janway, Flint and

Villa were not the core of the government's case.[4] They provided background testimony about the conspiracy. Indeed, when asked if Janway knew "whether or not [Harlow] was involved in any of the methamphetamine distribution activities," Janway testified, "No, sir, not to my knowledge." (Appellee's App. at 156.) While Flint testified he "fronted" Harlow an ounce of methamphetamine at some time during a three month period, he could not remember when. (Appellee's App. at 169.) However, when asked about the larger distribution on one pound of methamphetamine from Gillette to Texas, Flint testified he did not recall mentioning that Mr. Harlow was involved. (Appellee's App. at 175.) Villa testified that Harlow "fronted" him three ounces of methamphetamine some time in late 2000. Villa had no first-hand knowledge of the Texas incident. He merely testified that, some time in early 2001, he had heard "supposedly [Harlow] had stoled [sic] I think it was about a pound of meth from . . . Wolverine Trenching." (Appellee's App. at 190.) However, Villa then testified that when he spoke with Harlow about this rumor, Harlow denied it. (*Id*.) In fact, it was solely the testimony of Tullier and Parker that established first-hand knowledge of Harlow's involvement in the events surrounding the Texas delivery.

------

[4] According to Harlow, "Clinton Tullier and Larry Parker, Mr. Harlow's co-defendant, provided the only damaging evidence against Mr. Harlow for the ill-fated trip to Texas that was, according to the government, the 'centerpiece' of the case against Mr. Harlow." (Appellant's Br. at 38.)

Harlow tries to avoid the collateral nature of Janway, Flint and Villa's testimony by arguing that impermissible vouching of the credibility of three of the witnesses somehow tainted the testimony of Tullier and Parker, as the prosecutor introduced into evidence both of their plea agreements. However, the prosecutor's vouching of the three collateral witnesses occurred as a result of the introduction of their plea agreements combined with the introduction of their Rule 35(b) motions and sentence reduction orders. Such implicit vouching does not transfer to witnesses who noticeably have not received similar consideration.

Finally, to the extent the impermissible vouching occurred, the district court's credibility instructions cured any error. The instructions clearly apprised the jurors of the court's limited involvement, it was their responsibility to evaluate the credibility of the witnesses, and the testimony of co-conspirators and individuals receiving special consideration must be examined even more critically than ordinary witnesses.

Based on the above, the prosecutor's introduction of several witnesses' plea agreements, coupled with the government's Rule 35(b) motions seeking reduction of these witnesses' sentences and the sentence reduction orders themselves constituted error in the form of impermissible vouching for the credibility of the witnesses. However, in light of the context of the entire proceeding, including the strength of the evidence against Harlow, and the district court's curative

instruction, such error does not warrant a new trial.

*2. Prosecutor's Rebuttal Closing Argument*

Harlow next claims the district court erred by failing to sustain his objection to the government's closing argument, which he says impermissibly offered personal opinion as to the truthfulness of the co-conspirators testimony. In the context of this case, because Harlow contemporaneously objected to the prosecutor's closing argument statements and moved for a mistrial based on what is, essentially, an allegation of prosecutorial misconduct, we review the district court's denial of Harlow's motion for a mistrial for an abuse of discretion. *United States v. Broomfield,* 201 F.3d 1270, 1276 (10th Cir. 2000). Applying this standard, we conclude the district court did not abuse its discretion.

Reviewing claims of prosecutorial misconduct entails a two-step analysis. We must first determine whether the conduct was in fact improper. If the conduct was improper, we must then determine whether it warrants reversal. *Lonedog*, 929 F.2d at 572. Prosecutorial misconduct does not warrant a new trial if it was harmless error. *United States v. Alexander,* 849 F.2d 1293, 1296 (10th Cir.1988). "The Supreme Court has articulated different harmless-error standards, depending upon whether the error is of constitutional dimension. A non-constitutional error is harmless unless it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." *United States v. Rivera,* 900 F.2d

1462, 1469 (10th Cir. 1990) (en banc) (quoting *Kotteakos v. United States,* 328

U.S. 750, 765 (1946)). "On the other hand, most constitutional errors may be

declared harmless only if we are convinced, beyond a reasonable doubt, that they

did not affect the outcome of the trial." *Lonedog*, 929 F.2d at 572.; *see United*

*States v. Martinez*, 890 F.2d 1088, 1094 (10th Cir. 1989). Improper vouching for

witnesses is not considered to impact an express constitutional right. *See Cargle*

*v. Mullin*, 317 F.3d 1196, 1220 (10th Cir. 2003). Therefore, we treat vouching as

a non-constitutional error and examine whether it had a substantial influence on

the outcome, or leaves us in grave doubt as to whether it had such an effect.

In this case, the prosecutor's statement in rebuttal closing argument makes

explicit the problem implicit in the introduction of the Rule 35(b) motions and the

sentence reduction orders. Specifically, the prosecutor stated,

> Separation of powers. It's all here. Congress allows it to happen.
> The executive branch, representing the executive, we're involved.
> We use them as witnesses. *But what's really important, and you can*
> *have a chance to take a look at this, you've go the orders reducing*
> *their sentences signed by the judicial branch, Judge Johnson.*

(R. at 271.)

Aside from his inelegant discussion of our tripartite system of government,

the prosecutor stated Judge Johnson had signed off on the testimony of Janway,

Flint and Villa. In our view, this violates the prohibition against vouching.

While the prosecutor probably meant the jurors should look at the sentence

reduction orders as evidence that the judicial branch approves of sentence reductions and co-conspirator testimony in general, his statements to the jury were not so precise. Rather, he directed the jury to look at the sentence reduction orders and attach special importance to them. This is too easily construed as a statement that "the judicial branch, Judge Johnson" had personally approved the credibility of the witnesses' testimony by signing off on their sentence reduction orders.

The government tries to defend the rebuttal argument by stating that defense counsel had impermissibly attacked the prosecutor's character and veracity. Though a prosecutor's statements made in response to comments of defense counsel are given more latitude, such standard does not apply here. *United States v. Janus Indus.,* 48 F.3d 1548, 1558 (10th Cir. 1995) (considerable latitude given to prosecutor in closing argument where defense counsel "invites" argument). In his closing argument, defense counsel never named the prosecutor directly, called him a liar, or stated he had directly participated in creating false testimony. Rather, defense counsel confined himself to permissible challenges to the credibility of the government's witnesses in light of the plea agreements.

We conclude the prosecutor's statements during rebuttal closing argument coupled with the introduction of the Rule 35(b) motions and sentence reduction orders were error. In *Broomfield*, we took the "opportunity to advise prosecutors

against what we perceive to be an increasing willingness to unnecessarily push the envelope of improper vouching." 201 F.3d at 1276. We repeat that admonition here. Nevertheless, we conclude the district court did not abuse its discretion in denying Harlow's motion for a new trial. As discussed above, almost immediately after the closing arguments, the district court gave a clear and thorough curative instruction. This closely followed the prosecutor's improper statements and sufficiently disabused the jury of any misimpression created by the prosecutor's inartful closing argument. *See Broomfield*, 201 F.3d at 1277. Under these circumstances, we conclude the prosecutor's closing statements were not so egregious as to influence the jury to convict Harlow on improper grounds and did not warrant reversal. Therefore, the district court did not abuse its discretion in presenting a curative instruction to the jury rather than declaring a mistrial.

## B. Jury Poll

In Harlow's second category of error, he argues the district denied him the right to poll the jury to ensure unanimity of the verdict. He concedes that after the reading of the verdict, the district court offered him a chance to examine it. However, he maintains he was given insufficient time to respond to the court's invitation because the court immediately proceeded to advise the jury about a variety of issues related to the case. During this discussion, the district court allegedly confirmed Harlow's guilt, thus rendering subsequent polling a nullity.

After the discussion, but prior to the jury being dismissed, Harlow's counsel requested a poll, the result of which was a unanimous verdict. Harlow argues on appeal that the district court's statements interfered with his absolute right of a poll and requires reversal. The government presents a two-fold response, (1) Harlow was afforded an opportunity to poll the jury, but waived it through inaction, and (2) a poll is sufficient when it is conducted before the verdict is recorded and the jury is discharged, regardless of comments made by the judge.

"Polling [the jury] is one means of ensuring unanimity of a verdict." *United States v. Morris*, 612 F.2d 483, 489 (10th Cir. 1979); *see also Humphries v. District of Columbia*, 174 U.S. 190, 194-95 (1899). To that end, Rule 31(d) provides:

> After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury.

"[U]pon the appearance of any uncertainty or contingency in a jury's verdict, it is the duty of the trial judge to resolve that doubt . . . ." *Morris*, 612 F.2d at 489.

Rule 31(d) does not require a poll unless a party requests it, "but the parties must be afforded a reasonable amount of time within which to make the request." *United States v. Randle*, 966 F.2d 1209, 1214 (7th Cir. 1992). The failure to request a poll prior to the recording of the verdict waives the right. *United States*

*v. Neal*, 365 F.2d 188, 190 (6th Cir. 1966). Thus, "the district court, after the verdict has been read, [must] afford both counsel a reasonable opportunity to request a poll." *Randle*, 966 F.2d at 1214. The district court can accomplish this by "inquir[ing] of both counsel if either has anything further before the jury is discharged, which, of course, invites the request to poll." *Id*. Failure to allow a reasonable opportunity to poll prior to the district court discussing with the jury otherwise inadmissable evidence constitutes reversible error as it denies a meaningful opportunity to ensure the unanimity of the jury. *Id*.; *United States v. Marinari*, 32 F.3d 1209, 1212-13 (7th Cir. 1994).

As an initial matter, the government's argument that the request and execution of a poll prior to the verdict being recorded and the discharge of the jury automatically satisfies the requirements of Rule 31(d), regardless of any comments made by the judge, is unfounded. It is true that the poll must be requested and executed prior to the verdict being recorded and the jury discharged, *Miranda v. United States*, 255 F.2d 9, 19 (1st Cir. 1958); *Marinari*, 32 F.3d at 1214, but intervening comments by a judge can undermine the defendant's right to poll the jury. The issue in this case is whether Harlow was afforded a reasonable opportunity to poll the jury prior to the judge's potentially prejudicial comments.

The seventh circuit's opinion in *Randle* is instructive. In that case, one and

a half seconds elapsed between the return of the jury's verdict and the district court's reading of a probation officer's memorandum including the defendant's arrest record. 966 F.2d at 1214. Twelve seconds later, defense counsel objected, but by then the damage was done. *Id*. On appeal, the seventh circuit noted that "[a]lthough the district court may have thought that interval [of one second] sufficient time to allow counsel to request a poll, even the fastest thinking attorney could not have anticipated that the judge had concluded his remarks and was waiting for a request to poll." *Id*. The court held:

> The interval in this case clearly was inadequate. We . . . require the
> district court to afford both counsel a reasonable opportunity to
> request a poll. Because what is a reasonable time is fact specific and
> defies precise parameters, the better practice is for the district court
> to inquire of both counsel if either has anything further before the
> jury is discharged, which, of course, invites the request to poll.

*Id*. Thus, the court reversed the district court's denial of a mistrial and remanded for a new trial. *Id*. The seventh circuit's opinion stands for two propositions relevant to this case: (1) comments made by a judge prior to a request to poll can irreparably damage the defendant's right to poll; and (2) a district court should afford the parties a reasonable time to request a poll and can satisfy this requirement by inquiring of the parties if they have anything further before the jury is discharged.

In this case, the district court's comments to the jury appear to have the potential to prejudice Harlow's right to poll the jury. Harlow is right to point out

that such comments implied that the juror's verdict was accurate. *See Quercia v. United States*, 289 U.S. 466, 470 (1933) ("The influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling.") (internal quotation omitted). Such comments clearly present the possibility of changing a juror's otherwise uncertain guilty vote into a certain one.

As the government points out, however, all of the district court's comments commenced after it expressly gave Harlow an opportunity to poll the jury. In fact, the district court went beyond merely asking whether the parties had "anything further" and specifically asked if Harlow would like to "examine the verdict." Nor does it appear that the district court proceeded too quickly after making the offer to examine the verdict. In this case, the district court's comments do not appear pose the risk of prejudice until the discussion of its conversation with Special Agent Hamilton. The lapse of time between the reading of the verdict and the beginning of the potentially prejudicial comments was sufficient to allow Harlow to exercise his right to request a poll, in light of a specific invitation to do so. Thus, Harlow's delay in requesting a poll vitiates any error attributable to the district court's intervening comments between its specific invitation to poll the jury and Harlow's poll request.

## III. Cumulative Error

Harlow argues that even if we conclude all of the alleged individual errors are harmless, their combined effect results in a fundamentally unfair trial and requires reversal. The government's position is that Harlow has not shown actual error and therefore, there is no error to cumulate.

The cumulative error analysis' purpose is to address whether the "cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rosario Fuentez*, 231 F.3d 700, 709 (10th Cir. 2000). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Sarracino*, 340 F.3d 1148, 1169 (10th Cir. 2003), *cert. denied sub nom*, 540 U.S. 1131 & 540 U.S. 1133 (2004) (internal quotation omitted). "Unless an aggregate harmlessness determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless. The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error – courts look to see whether the defendant's substantial rights were affected." *Id*. However, we evaluate only the effect of matters determined to be

error, not the cumulative effect of non-errors. *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990).

At best, Harlow can only demonstrate error attributable to the prosecutor's impermissible vouching for the credibility of three of the witnesses in the form of his introduction of the Rule 35(b) motions and sentence reduction orders and his closing argument. Because we have concluded the instances of vouching did not, together, affect Harlow's substantial rights, these errors cannot constitute cumulative error. There are no other errors to add.

## IV. Conclusion

For the reasons given, Harlow's conviction is **AFFIRMED**. The motion to withdraw John M. Nicholson as counsel for appellant is granted.