**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 15, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BRIAN HAYDEN ALLEN,

Defendant-Appellant.

No. 14-8064
(D.C. No. 2:14-CR-00077-SWS-1)
(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE,** Chief Judge, **BALDOCK** and **BACHARACH**, Circuit Judges.

Defendant Brian Allen was convicted of being a felon in possession of a firearm

and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He now appeals

that conviction, alleging that the district court improperly admitted certain evidence at

trial. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

**I**

On the evening of January 29, 2014, the Cheyenne police received a 911 call about

a kidnapping. The 911 caller, later identified as Kelly Fryman, told the police that her

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

boyfriend, Shawn Barry, had been taken at gunpoint and was being held captive. It was later determined that Barry was being held at the Outlaw Saloon in Cheyenne, Wyoming.

When the police arrived at the Outlaw Saloon, they found Barry sitting at a table with two other men, Jonathan Leeka and the appellant, Brian Allen. All three men were drinking. Officer Gaskins, along with another officer, approached the table and frisked each of the men for weapons. Neither Allen nor Barry had any weapons; however, Leeka was found in possession of a gun. Following a police investigation, Allen was charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). At trial, Leeka, Barry, and Fryman all testified. Their collective testimonies described the following events:

During the afternoon of January 29, 2014, Leeka and Allen drove around town in Leeka's white pick-up truck. The two men had lunch and then went to a tattoo parlor and to several bars. According to Leeka, Allen had a "good buzz going" throughout the afternoon. ROA, Vol. 3 at 109.

After the two men left the last bar, Leeka started driving back toward Allen's house. As they were driving through Allen's neighborhood, Allen noticed a small white Kia, which was double parked in front of an apartment complex. Allen told Leeka that the car belonged to a friend of his and that he wanted to stop and wait for his friend. Leeka did as Allen asked and pulled over. As they waited for Allen's friend, Allen asked Leeka if he still had a gun in the glove box. Leeka said that he did and gave Allen the key to the glove box. Allen removed the gun and loaded it with the magazine, which was

2

sitting on top of the gun in a holster.

According to Leeka, Allen's demeanor suddenly changed after that. Allen became "cold and angry." ROA, Vol. 3 at 119. Allen told Leeka that his "friend" with the Kia was in trouble because he had been telling people that he was a member of the same violent gang as Allen and that he was buying cocaine. Allen also told Leeka that Leeka was going to help him "do this," or Leeka and everyone he cared about would be "slaughtered." ROA, Vol. 3 at 120.

Following this exchange, Leeka and Allen saw Shawn Barry emerge from one of the apartments. The apartment Barry came out of belonged to his then-girlfriend (now fiancée) Kelly Fryman. Barry had made plans with Fryman to go out that night. But when Barry arrived, Fryman was not quite ready so Barry stepped outside to smoke a cigarette and take the dog out. Soon after Barry left the apartment, he ran into Allen. Allen ordered Barry to get into the driver's seat of the Kia. Allen then took the dog from Barry, put the dog back in Fryman's apartment, and got into the passenger seat of the Kia. Barry noticed that Allen had a black semi-automatic handgun in his hand. Allen pointed the gun at Barry and told him to drive.

As Barry was driving, he noticed a white pick-up truck following them. Allen told Barry that the person in the truck had an "AR" pointed at them. Id. at 169. Barry drove about a block before he pulled into the parking lot of a church. Fryman, who had seen the Kia pull away from in front of her apartment complex and into the parking lot, ran up to the car and knocked on the window. She immediately recognized the man in the

3

passenger seat as Allen. She also saw that Allen had a gun, which she described as silver, although the gun the police recovered that night was black. Both Barry and Allen told Fryman to leave. But before she did, Barry gave Fryman a hug and whispered in her ear to "call the cops." Id. at 170. Fryman left and called 911.

In the meantime, Barry and Allen started driving toward the Outlaw Saloon, with Leeka following. After arriving at the saloon, Barry was patted down. During the pat-down, one of Barry's two cell phones was taken. His second cell phone, which he had concealed in his waistband, remained in his possession.

All three men—Barry, Allen, and Leeka—then went into the saloon and bought some drinks. Barry told Allen and Leeka that he needed to use the bathroom. Barry hoped that he would be able to text Fryman while in the bathroom. However, Allen ordered Leeka to follow Barry into the bathroom. A few minutes after Barry and Leeka had entered the bathroom, Allen came in. Allen told Leeka to let Barry use the stall. Barry was then able to text Fryman. He told her that he was at the Outlaw Saloon and to call the police.

While Barry was in the stall, Leeka asked Allen for his gun back; Leeka told Allen that he did not need to be caught with a gun. Allen agreed and gave the gun back to Leeka. All three men then left the bathroom and returned to their table. A few minutes later, the police arrived and took the men into custody.

In addition to the testimonies of Leeka, Barry, and Fryman, several police officers also testified at trial, including Officers Casey Patterson and Robert Gaskins, as well as

4

Detective Micah Veniegas. Officer Patterson testified that he was on duty that night and that around 10 p.m. he was dispatched to the apartment complex where Fryman lived. Officer Patterson stated that he had received the following information from dispatch: that a "kidnapping had occurred in front of [Fryman's] residence," and that Fryman "followed on foot the vehicle that was being driven by her boyfriend to [a] parking lot" nearby. Id. at 252. Officer Patterson drove by the church parking lot, which was now empty, and then to Fryman's apartment. As he was speaking with Fryman, Officer Patterson stated that Fryman received a text message, which said, "I'm at the Outlaw, let them know." Id. at 254.

Officer Gaskins was also on duty that night. He too was told that a 911 call had come in about a potential kidnapping. Officer Gaskins said that dispatch had told him to be on the lookout for two vehicles that matched the description of Leeka's truck and Barry's Kia. Officer Gaskins testified that a short time later another call came in saying that the suspects might be at the Outlaw Saloon. Officer Gaskins then went to the Outlaw Saloon, where he noticed both Leeka's and Barry's vehicles in the parking lot. He and another officer went into the saloon and saw Barry waving his hands at them. The officers walked over to the table where Allen, Leeka, and Barry were sitting and frisked them. As Officer Gaskins was frisking Barry, Barry told him that he had a cell phone but that he did not want the other men to know about it. Officer Gaskins was wearing a recorder throughout this incident.

The last officer to testify was Detective Micah Veniegas. Detective Veniegas

5

stated that he interviewed Leeka, Barry, and Fryman, and that he had participated in the search of Leeka's truck. Detective Veniegas indicated that they found an empty holster, one magazine with ten bullets, and a wallet in Leeka's truck. He also testified that the police downloaded Barry's cell phone records from that night and that those records showed a text message from Barry to Fryman saying, "At the Outlaw call now." Id. at 267-68.

Finally, the prosecution also had a DNA expert, Michelle Martin, testify. Martin, a forensic biologist at the Wyoming State Crime Lab, stated that she was asked to test several pieces of evidence for DNA, including a firearm, magazine, and ammunition. She explained that she found a mixture of DNA on the evidence, which she ran against four samples she had received from the police. Those four samples were from Allen, Leeka, Officer Patterson, and another deputy officer. When asked whether she was able to draw any conclusions from her tests about who possessed the firearm, all she could say was "No, I could not." Id. at 305.

Based on this evidence, the jury convicted Allen of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Allen now appeals his conviction, arguing that the district court erred by admitting several pieces of evidence. In particular, Allen argues that the district court erred by (1) allowing Martin to testify that, based on her DNA tests, she could not tell who possessed the gun; (2) allowing the prosecution to impermissibly bolster two of its witnesses—Leeka and Barry; and (3) allowing testimony regarding Allen's alleged affiliation with a violent gang.

6

Allen argues that these errors were not harmless and require reversal.

We disagree.  Because we conclude that the district court did not err in admitting any of the challenged evidence, we affirm Allen's conviction.

**II**

1. *DNA Evidence*

Allen first challenges the admission of Martin's testimony that the results of her DNA tests were inconclusive.  We review the district court's decision to admit this evidence for abuse of discretion.  See United States v. Talamante, 981 F.2d 1153, 1155 (10th Cir. 1992).

Allen contends Martin's testimony was admitted in violation of Federal Rule of Evidence 403.  Rule 403 states that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Allen contends that Martin's testimony should have been excluded because it had little, if any, probative value and was highly prejudicial.

While it is a bit baffling why the prosecution would choose to present this inconclusive testimony at all, we conclude it was not error to allow its admission.  Martin testified that she received a firearm, several rounds of ammunition, and a magazine to test for DNA; that she compared the DNA she found on those items to the DNA samples she received from Allen, Leeka, Officer Patterson, and another deputy officer; and that she

was not able to draw any conclusions from her tests. Put simply, Martin testified that she could not determine who possessed the gun. Martin's testimony was seemingly insignificant. She could not implicate Allen nor could she rule him out. While the probative value of this evidence was minimal at best, the danger of unfair prejudice against Allen was even more slight. Martin's testimony was not confusing, nor was it likely to lure the jury into improperly believing that Allen's DNA was part of the mixture found on the gun. Martin simply stated that she could draw no conclusions about who did or did not possess the gun. Moreover, although the prosecution presented this testimony, it likely benefitted Allen more than it did the prosecution, for if Allen handled the gun in the way that Leeka and Barry described, then his DNA would presumably be all over the gun. Thus, the district court did not abuse its discretion in admitting this evidence.

2. *Bolstering of Witnesses*

Allen next argues that the prosecution improperly vouched for and bolstered the credibility of two of its witness: Leeka and Barry. Specifically, Allen challenges statements elicited by the prosecution from Leeka regarding a proffer agreement he made and statements elicited from Fryman regarding the veracity of her fiancé, Barry. We address each challenge in turn.

a. *Statements from Leeka*

Leeka testified that on the night in question he originally lied to the police, telling them that he was the only one who possessed the gun that night. One week later, Leeka agreed to proffer his testimony to state detectives. He explained that his proffer

8

agreement required that he be truthful and that he continue to cooperate with the investigation and prosecution of Allen. After Leeka explained his proffer agreement during his trial testimony, the prosecution asked him whether he told the truth when he made his proffer. Leeka said he had. Leeka then went on to testify that he met with federal authorities regarding the federal case against Allen and that the same requirement to tell the truth applied. Leeka explained that it was his understanding that the federal authorities could not directly affect the state kidnapping charges against him, but that the state would consider input from federal authorities based on Leeka's cooperation in the federal case. Allen objected to all of these statements, citing Federal Rule of Evidence 608. The district court overruled Allen's objections. We review the district court's ruling de novo. United States v. Anaya, 727 F.3d 1043, 1052 (10th Cir. 2013).

It is well established that the prosecution may not personally vouch for or bolster the credibility of a witness. See United States v. Harlow, 444 F.3d 1255, 1262 (10th Cir. 2006); see also United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990). However, that is not what occurred in this case. In this case, Leeka's testimony regarding his proffer agreement simply revealed that Leeka had an obligation to tell the truth on the day of his proffer and also the consequences of Leeka's decision to abide by or breach that agreement. See id. at 1499. This did not amount to bolstering. See Harlow, 444 F.3d at 1262 (explaining that it is not improper for the prosecution to "introduce a witness's plea agreement on direct examination, even if it includes a truthfulness provision," and to "discuss [that] provision [to] make sure the witness is aware of the consequences of

9

failing to tell the truth" and to "head off claims that the witness' testimony is suspect due to the plea agreement"); United States v. Jones, 468 F.3d 704, 708 (10th Cir. 2006) (applying same rules to plea agreements and proffer agreements); see also United States v. Magallanez, 408 F.3d 672, 680 (10th Cir. 2005); United States v. Lord, 907 F.2d 1028, 1030-31 (10th Cir. 1990).

A discussion of the "'truthfulness' portion[]" of a witness' agreement with the government only becomes impermissible bolstering "when the prosecutors explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness' testimony." Bowie, 892 F.2d at 1498. We have no evidence that the prosecution did that here. All that we have here is a colloquy involving Leeka's proffer agreement and the potential impact Leeka's cooperation in Allen's federal prosecution could have on the state charges that had been brought against him. This colloquy did not constitute impermissible bolstering by the prosecution.

The only portion of Leeka's testimony that could come close to being considered impermissible bolstering is the exchange discussing whether Leeka testified truthfully on the day of the proffer. But again, this does not rise to the level of impermissible bolstering. The prosecution did not make any personal guarantee that Leeka's testimony was truthful, see Jones, 468 F.3d at 708, nor did it suggest that it could verify or monitor the truthfulness of Leeka's testimony, see Bowie, 892 F.2d at 1498. The prosecution asked Leeka whether he told the truth on that day, to which Leeka said yes. The jury was free to make its own credibility determination when it heard Leeka's testimony.

10

b. *Statements from Fryman*

Allen also argues that Fryman impermissibly bolstered the credibility of her fiancé, Barry. The prosecution asked Fryman about a false kidnapping report Barry had made several months after the January 2014 incident at issue in this case. The prosecution asked Fryman whether Barry had "told [her] the truth" about those false kidnapping allegations, to which Fryman said yes. ROA, Vol. 3 at 337. The prosecution also asked Fryman whether Barry would lie to her, and whether she often suspected he might be lying to her. Again, Fryman said yes. Allen objected to all of these statements under Federal Rule of Evidence 608. The district court sustained Allen's objection and offered a curative instruction to the jury. Allen made no objection to the instruction provided by the court.

Because Allen did not object to the court's curative instruction or ask for a mistrial, our review is for plain error. See Anaya, 727 F.3d at 1052 ("[W]hen the defendant objects at trial based on prosecutorial misconduct, the district court sustains the objection and takes curative action such as giving a jury instruction, and the defendant fails to object to the adequacy of the curative action or ask for a mistrial, we review for plain error."). Under plain error review, the defendant must show that "there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Gonzalez-Huerta, 403 F.3d 727, 732 (10th Cir. 2005) (en banc); see also United States v. Romero, 491 F.3d 1173, 1178 (10th Cir. 2007).

11

At the outset, it is not clear that Fryman's testimony even constitutes impermissible bolstering. The prosecution asked Fryman whether Barry had told her the "truth" about his having made a false police report alleging that he had been kidnapped for a second time several months after the original January 2014 incident. The prosecution also asked Fryman whether she had suspected Barry was lying to her about those allegations. The focus of this discussion was on whether Barry lied to the police about this second kidnapping, and on whether he eventually admitted to lying. It is possible that from this exchange the jury might have believed that Fryman was capable of detecting when Barry was lying to her, but we find that unlikely. Fryman stated that she thought Barry was lying about the second kidnapping because his timeline seemed "fishy" and he could never fully explain what had happened. ROA, Vol. 3 at 337. We do not read her statements as indicating that she could detect when Barry was lying; rather, we read them as indicating that in this one particular instance, Fryman felt like something just did not track. Accordingly, we question whether this challenged testimony even constitutes impermissible bolstering.

Regardless, we need not decide this issue, as even if the district court is correct that Fryman's testimony rose to the level impermissible bolstering, we conclude there was no reversible error. Here, the district court sustained Allen's objection to Fryman's testimony and immediately provided the jury with a curative instruction in which the court told the jury that only it was allowed to assess the credibility of witnesses. In so doing, the district court corrected any potential prejudice that may have resulted from

12

Fryman's statements. And given the strength of the evidence presented against Allen, any prejudice that may have remained from Fryman's testimony after the curative instruction was given did not rise to the level of plain error that affected Allen's substantial rights or the fairness or integrity of Allen's trial. See Anaya, 727 F.3d at 1057-58; see also United States v. Torres, 53 F.3d 1129, 1141 (10th Cir. 1995). Thus, the district court did not plainly err.

3. *Gang Evidence*

Allen next argues that the district court erred in admitting evidence of his alleged affiliation with a violent gang under Rule 404(b) of the Federal Rules of Evidence. The prosecution argues that Rule 404(b) is inapplicable because it only applies to evidence of acts that are extrinsic to the charged crime. According to the prosecution, this evidence was properly admitted not under Rule 404(b), but as evidence intrinsic to the events that occurred on the night in question. We review the district court's decision to admit this evidence for abuse of discretion. Talamante, 981 F.2d at 1155.

We agree with the prosecution that this evidence was properly admitted as intrinsic evidence.[1] Rule 404(b) does not apply to evidence of acts that are intrinsic to the charged

---

[1] The basis for the district court's decision to admit this gang evidence is not entirely clear. When the court initially ruled on whether the evidence could be admitted, it suggested the evidence was "intrinsic;" yet, it also stated that the evidence went to "motive, which is one of those factors under 404(b) . . . ." ROA, Vol.3 at 29. The district court then restated its ruling a short time later, and when it did, it went through a Rule 404(b) analysis. Id. at 54. However, in doing so, the district court stated that it was going through the Rule 404(b) analysis as an "alternative," as it had "already found that [the evidence] was intrinsic to the issues regarding the charge in this matter." Id. While the

(continued...)

13

crime. See United States v. Lambert, 995 F.2d 1006, 1007 (10th Cir. 1993); United States v. Pace, 981 F.2d 1123, 1135 (10th Cir. 1992). "Other act evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the charged crime." Lambert, 995 F.2d at 1007 (internal quotation marks omitted). "Such intrinsic 'other act' evidence, although not excluded by 404(b), is still subject to the requirement of Fed. R. Evid. 403 that its probative value is not substantially outweighed by the danger of unfair prejudice." Id. (internal citation omitted).

In this case, the evidence of Allen's alleged affiliation with a violent gang provided the jury with relevant context for both Leeka's and Barry's testimonies. In particular, it explained the nature of Allen's relationship with Barry; it explained why Allen approached Barry that night; and it explained why Leeka entertained Allen's demands. See United States v. Parker, 553 F.3d 1309, 1314 (10th Cir. 2009) ("[I]ntrinsic evidence is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury." (internal quotation marks omitted)). This evidence was an "integral and natural part" of both Leeka's and Barry's "accounts of the circumstances surrounding the offense" in this case. United States v. Johnson, 42 F.3d 1312, 1316 (10th Cir. 1994) (internal quotation marks omitted). Accordingly, this

_____

(...continued)
district court could have been clearer at the outset, we conclude that its later discussion of this evidence indicates that it considered the evidence to be intrinsic evidence.

14

evidence was properly considered intrinsic evidence.

That does not end our analysis, however, as we must also consider whether the district court properly admitted this evidence pursuant to Federal Rule of Evidence 403. See Lambert, 995 F.2d at 1007-08. We conclude that it did. Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Unfair prejudice in this context means "an undue tendency" to decide an issue "on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note.

Here, the evidence of Allen's gang affiliation was probative in explaining the relationship among and between Allen, Leeka, and Barry. It explained why Allen wanted to possess the gun and why Leeka and Barry acted the way they did. And while evidence of a defendant's gang affiliation can be highly prejudicial in many instances, this is not one of those instances. In this case, the district court not only limited the gang evidence that could be admitted by precluding the parties from stating the name of the gang with which Allen was associated, see ROA, Vol. 3 at 29-30, but it also provided the jury with a limiting instruction after this evidence was first introduced,[2] see id. at 119-20. Under these circumstances, the evidence's probative value was not substantially outweighed by

_____

[2] The district court's limiting instruction stated: "Ladies and gentlemen of the jury, you have heard and will hear testimony as to Defendant's alleged affiliation with a violent gang. That testimony is admitted for the sole purpose of establishing the motive for the alleged actions taken by the Defendant and/or witnesses and may only be considered for this limited purpose. Membership or affiliation in a gang is not a crime." ROA, Vol. 3 at 119-20.

15

the danger of unfair prejudice. The district court did not abuse its discretion in admitting evidence of Allen's alleged affiliation with a violent gang.

4. *Cumulative Error*

Allen's final argument on appeal is that, collectively, the admission of all of the evidence discussed above constituted prejudicial error that warrants reversal. When performing a cumulative error analysis, we aggregate all the errors that have been found individually to be harmless and analyze whether the cumulative effect of those errors on the outcome of the trial is no longer harmless. See United States v. Lopez-Medina, 596 F.3d 716, 740-41 (10th Cir. 2010). Because Allen has failed to establish the existence of any errors, harmless or otherwise, he is precluded from relying on the cumulative error doctrine. See id. (internal quotation marks omitted).

Regardless, even if we were to assume that the district court erred in admitting the evidence discussed above, it amounts to nothing more than harmless error. An error is harmless unless it has a "'substantial influence on the outcome of the trial'" or "'leave[s] one in grave doubt as to whether it had such effect.'" United States v. Resendiz-Patino, 420 F.3d 1177, 1181 (10th Cir. 2005) (quoting United States v. Jones, 44 F.3d 860, 873 (10th Cir. 1995)); see also United States v. Medina-Copete, 757 F.3d 1092, 1108 (10th Cir. 2014); Kotteakos v. United States, 328 U.S. 750, 769 (1946). At trial, the prosecution presented the testimony of Leeka, Barry, and Fryman, as well as the responding officers. All of these witnesses told a similar story. Their stories were further corroborated by the recording of Fryman's 911 call, by the recording obtained from

16

Officer Gaskins at the Outlaw Saloon, and by Barry's cell phone records. Taking all of this evidence into account, we are not left in "grave doubt" as to whether the admission of the allegedly improper evidence discussed above substantially influenced the outcome of Allen's trial. The strength of the evidence presented against Allen, even taking into account these potential errors, was more than sufficient to convict Allen.

## III

We AFFIRM Allen's conviction.

Entered for the Court

Mary Beck Briscoe
Chief Judge

17