FILED
United States Court of Appeals
Tenth Circuit

April 28, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

PAUL OTHELLO SMALLS,

Defendant-Appellant.

No. 12-2145

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 2:06-CR-02403-RB-1)**

---

Amy Sirignano, Albuquerque, New Mexico, for Appellant.*

Richard C. Williams, Assistant United States Attorney (Kenneth J. Gonzales, United States Attorney, with him on the brief), Las Cruces, New Mexico, for Appellee.

---

Before **TYMKOVICH**, **BALDOCK**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

_____
        * The Court's April 16, 2014 Order granted Ms. Sirignano's withdrawal, and on April 25, 2014, the Court accepted a notice of appearance by Howard A. Pincus of the Colorado and Wyoming Federal Public Defender's Office for the Appellant.

After a suspicious death in a New Mexico prison cell, police eventually identified Paul Smalls, the victim's cellmate, and two other men as the perpetrators of murder. Their scheme was to smother the victim, and then claim he died of an asthma attack. At trial, the government pointed to "signature quality" evidence that Smalls had threatened his asthmatic ex-wife in a similar fashion five months before the murder. Smalls and the other men were found guilty of the murder of Phil Gantz, who at the time was cooperating with federal and state authorities against members of a drug trafficking ring.

Smalls appeals his conviction, arguing that he received a fundamentally unfair trial because (1) the district court erred in several of its evidentiary rulings, including allowing the testimony of his ex-wife about his prior statement; (2) the government committed prosecutorial misconduct; (3) the court abused its discretion in denying certain jury instructions; and (4) there was insufficient evidence to sustain his convictions. Smalls asserts that he is entitled to a new trial because the aggregate effect of these errors amounts to cumulative error.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM. We conclude the district court did not abuse its discretion or plainly err in admitting the challenged pieces of evidence; the government did not commit prosecutorial misconduct by introducing co-conspirator testimony or vouching for the witnesses; the court did not abuse its discretion denying Smalls's proposed jury

instructions because the instructions adequately conveyed the law and Smalls's theory of the case; and there was sufficient evidence to sustain the convictions. Because the district court did not commit error, a cumulative error analysis is unwarranted.

## I. Background

At the time of Gantz's murder, Smalls was being held in pre-trial custody at the Doña Ana County Detention Center in New Mexico, where he was formerly a corrections officer. He was awaiting trial on state charges for an August 2004 assault on his then-wife.

Smalls shared a medical unit cell with three other prisoners. One cellmate, Gantz, had been arrested in May 2003 as part of an investigation into methamphetamine trafficking in Roswell, New Mexico. After being charged in federal court, he decided to cooperate with law enforcement. His plea agreement stipulated that he would testify as a witness for the government in the future. Based in part on the information Gantz provided, law enforcement approached, and eventually indicted, an alleged drug trafficker. Another cellmate was Glenn Dell Cook, who had been placed in the cell after fighting with his former cellmate. Cook was in pre-trial custody on charges of methamphetamine trafficking. The fourth cellmate was Walter Melgar-Diaz (Melgar), who was in pre-trial custody for illegal reentry into the United States and had moved into the

cell only a week before the murder. Although Melgar spoke only Spanish, he was nevertheless able to communicate to some extent with his cellmates.

Before Smalls's murder trial, Cook and Melgar made agreements with federal prosecutors and testified against Smalls. According to them, Smalls was the ringleader of the plot to kill Gantz. Melgar testified that Smalls had told him that Gantz was a "rat" and had to be killed. He also described how Smalls pressured him into committing the murder by explaining that Gantz had helped capture four "Michoacanos," who Smalls referred to as Melgar's "people." R., Vol. V at 648. Melgar further testified that Smalls said that no one would suspect anything because Gantz had asthma, and the death would look like a result of natural causes.

Cook testified that Smalls told him about Gantz's cooperation with authorities, that certain people wanted Gantz dead, and there was a hit on Gantz. Cook did not like Gantz because he was a "snitch" and bragged about getting a reduced sentence. Cook also testified that he did not know they were going to kill Gantz—he thought they were just going to hurt him and that Melgar and Smalls planned the murder.

According to Melgar, at 1:30 a.m. on December 30, 2004, Smalls woke up Melgar, and Cook handed Melgar a plastic bag. Then, Smalls instructed Melgar to put the bag over Gantz's face, which he did using closed fists. Smalls held down Gantz's legs and Cook restrained Gantz's chest and arms. After the murder,

according to Melgar, Smalls instructed the other two not to talk about the murder because "they" would think Gantz suffocated because of the asthma. Cook's description of the murder was almost identical, and he explained that the murder took about twenty seconds and there were only eight seconds of silent struggle. Smalls testified that he slept through the murder.

The next morning, Gantz's body was found, but there were no apparent signs of foul play. On December 31, an autopsy revealed a hemorrhage in three layers of the neck, indicating that Gantz had died by carotid strangulation, not by suffocation. There were also no defensive wounds found on the body, which was consistent with being restrained. According to expert testimony offered by the government at trial, the assailant could have caused the strangulation by holding a plastic bag with two fists and wrapping it around the bottom of the jaw.

The sheriff's office initially investigated the murder, and federal investigators joined in April 2005. That summer, Cook told a fellow inmate about the murder. Unbeknownst to Cook, the inmate was cooperating with investigators and wearing a wire. Meanwhile, Melgar suffered severe mental turmoil after the murder. He claimed to have seen Gantz's ghost and began to cut himself. He was transferred to a treatment facility in Missouri and, upon his return, received medication and was declared competent by the court. In February 2006, Melgar met with his attorney after the government informed her it was interested in talking to Melgar about Gantz's murder. In a conversation with his attorney, he

confessed to killing Gantz along with Smalls and Cook and gave a videotaped statement to the FBI on February 24, 2006.

After a trial in which Melgar and Cook testified against Smalls, Smalls was found guilty of five federal offenses:

- Conspiracy to retaliate against a witness, victim, or informant in violation of 18 U.S.C. § 1513(f);
- Retaliating against a witness, victim or informant in violation of 18 U.S.C. § 1513(a)(1)(B);
- Conspiracy to tamper with a witness, victim, or informant in violation of 18 U.S.C. § 1512(k);
- Tampering with a witness, victim, or informant in violation of 18 U.S.C. § 1512(a)(1)(A) and (C);
- Killing a person aiding in a federal investigation in violation of 18 U.S.C. § 1121(a)(2).

On appeal, Smalls argues that the district court's numerous errors constitute cumulative error and warrant a new trial.

## II. Analysis

Smalls asserts four classes of errors relating to (1) evidence that was admitted at trial; (2) prosecutorial misconduct; (3) the jury instructions; and (4) sufficiency of the evidence. As we explain, none of these contentions amounts to reversible error, nor is there any basis for finding cumulative error.

### A. Evidentiary Issues

Smalls asserts the district court erroneously admitted a number of pieces of evidence relating to his conduct and the conduct of the other persons involved in the murder: (1) Smalls's statement to his wife during her asthma attack admitted

as "signature quality" evidence pursuant to Rule 404(b) of the Federal Rules of Evidence; (2) his prior felony convictions admitted as impeachment evidence pursuant to Rule 609(a)(1); (3) statements by Cook and Melgar admitted as statements by co-conspirators pursuant to Rule 801(d)(2)(E); (4) statements by Cook and Melgar admitted as prior consistent statements pursuant to Rule 801(d)(1)(B); and (5) video surveillance, still photos, and accompanying testimony related to Smalls's conversations with a fellow inmate.[1]

As long as there was an objection to the admission of evidence, "[w]e review for abuse of discretion the district court's evidentiary rulings, considering the record as a whole." *United States v. Becker*, 230 F.3d 1224, 1228 (10th Cir. 2000). We will not reverse a district court's decision if it "falls within the bounds of permissible choice in the circumstances." *United States v. Cardinas Garcia*, 596 F.3d 788, 797 (10th Cir. 2010). Nor will we reverse that decision "absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *United States v. Stiger*, 413 F.3d 1185, 1194 (10th Cir. 2005).

If there was no objection, we review for plain error. "We find plain error only when there is (1) error, (2) that is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of

---

[1] At oral argument, Smalls abandoned his claim that the district court improperly admitted evidence under the forfeiture by wrongdoing exception to the rule against hearsay. Fed. R. Evid. 804(b)(6).

judicial proceedings." *United States v. Romero*, 491 F.3d 1173, 1178 (10th Cir. 2007). "The plain error standard presents a heavy burden for an appellant" and "is to be used sparingly." *Id.* at 1178–79.

We evaluate the evidentiary claims under these standards.

### 1. *Signature Quality Evidence Under Rule 404(b)*

Smalls had a tumultuous relationship with his ex-wife, which included a domestic assault that took place in 2004. The district court allowed evidence of the assault to be admitted at trial, and, in particular, testimony that elements of the attack on his ex-wife bore a strong resemblance to the plan to kill Gantz.

Under Rule 404(b) of the Federal Rules of Evidence, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove a person's character in order to show action in conformity therewith. *It may, however, be admissible for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .*"[2] This rule "is one of inclusion, rather than exclusion, unless the evidence is introduced for the impermissible purpose or is unduly prejudicial." *United States v. Segien*, 114 F.3d 1014, 1022 (10th Cir. 1997), *overruled on other grounds as recognized in United States v. Hathaway*, 318 F.3d 1001, 1006 (10th Cir. 2003).

---

[2] Smalls was tried under the version of the Federal Rules of Evidence in place in November 2011, which has subsequently been amended for style only. All citations to the Rules of Evidence will be to the version in place at the time of Smalls's trial.

We consider a four-part test when determining whether evidence is admissible under Rule 404(b):

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

*United States v. Davis*, 636 F.3d 1281, 1297 (10th Cir. 2011) (citation omitted); *see also Huddleston v. United States*, 485 U.S. 681, 691–92 (1988) (discussing the four sources of "protection against . . . unfair prejudice" when admitting evidence under Rule 404(b)).

The district court admitted evidence that Smalls pleaded guilty to a domestic assault against his ex-wife,[3] which took place about five months before Gantz's murder, and allowed his ex-wife to testify about a statement Smalls made during the altercation underlying the assault conviction. The objected-to testimony goes like this. When his wife began having an asthma attack during the altercation, Smalls prevented her from accessing her inhaler and said to her: "Go ahead and just die. And that way, I won't have to—it will just be natural causes

---

[3] He was convicted of Aggravated Battery Against a Household Member with a Deadly Weapon and Criminal Sexual Penetration. For Rule 404(b) purposes, only evidence of the battery conviction was admitted. The district court allowed admission of the Criminal Sexual Penetration conviction for impeachment purposes under Rule 609(a)(1). *See infra* at 14.

and I'll be done with you." R., Vol. V at 607. Smalls eventually gave her the inhaler. The district court held that the evidence was admissible for the proper purposes of showing common identity and plan under Rule 404(b). The court reasoned that Smalls's verbalized intent to use the victim's asthma as a means to cover up the victim's anticipated death in both the assault on his wife and in the alleged murder of Gantz was "signature quality" evidence that showed common identity of the assailant.

Smalls argues that "an offhand comment during a lengthy domestic violence incident, not followed through on by Smalls" does not prove "that he is the same person who planned a cold-blooded murder by a different means for the benefit of a drug-trafficking organization" to which he had no ties. Reply Br. at

11.[4]  He points to cases in which there were more pervasive similarities among the crimes at issue.

Our cases interpreting Rule 404(b) allow evidence that tends to show the defendant's identity as the perpetrator of the charged offense because the defendant proceeded by a unique *modus operandi* evident in prior crimes. For example, in *United States v. Gutierrez*, we held that "[i]f the crimes share elements that possess 'signature quality,' evidence of the 'other crime' may be admitted." 696 F.2d 753, 755 (10th Cir. 1982). We concluded that the defendant's driving the getaway car and using her children as cover during the getaway in two robberies constituted signature quality evidence. *Id.* "Elements relevant to a 'signature quality' determination include the following: geographic location; the unusual quality of the crime; the skill necessary to commit the acts;

_____

[4] Smalls also argues that the evidence was unduly prejudicial under Rule 403. At the time of trial, Rule 403 provided that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Exclusion of otherwise admissible evidence under Rule 403 "is an extraordinary remedy and should be used sparingly." *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001).

The district court did not abuse its discretion in concluding that the risk of undue prejudice did not substantially outweigh the evidence's probative value. Smalls's statement does not show how Smalls actually behaved throughout the domestic dispute; it concerned only his plans to cover up the death and thus helped establish his identity as a conspirator in Gantz's murder, where he used a similar excuse. And the crimes were sufficiently dissimilar to reduce the likelihood that the jury would convict Smalls on the basis of conformity evidence.

or use of a distinctive device." *United States v. Shumway*, 112 F.3d 1413, 1420 (10th Cir. 1997) (citations omitted). This list is not exhaustive, but it does underscore the requirement that the characteristics of the crimes "be so unusual and distinctive as to be like a signature." *United States v. Connelly*, 874 F.2d 412, 417 (7th Cir. 1989) (emphasis omitted).

A court's assessment of the number and pervasiveness of similarities between the crimes may help determine whether they possess signature qualities, but the distinctiveness of common characteristics is also relevant to the inquiry. In *Shumway*, we stated,

> the weight to be given to any one element and the number of elements necessary to constitute a "signature" are highly dependent on the elements' uniqueness in the context of a particular case. In other words, a few highly unique factors may constitute a "signature," while a number of lesser unique factors "although insufficient to generate a strong inference of identity if considered separately, may be of significant probative value when considered together."

112 F.3d at 1420 (quoting *United States v. Myers*, 550 F.2d 1036, 1045 (5th Cir. 1977)). Where only one common characteristic of two crimes is particularly distinctive, that similarity may be sufficient on its own to show signature quality. *Compare United States v. Howe*, 538 F.3d 842, 849 (8th Cir. 2008) (stripping victim naked at gunpoint during robberies was so "unusual and distinctive enough as to be like a signature"), *abrogated on other grounds by United States v. Villareal-Amarillas*, 562 F.3d 892 (8th Cir. 2009), *with United States v. Thomas*,

-12-

321 F.3d 627, 635 (7th Cir. 2003) (pattern of dropping contraband and fleeing police was too "garden variety" to constitute signature quality evidence). *See also United States v. Andrini*, 685 F.2d 1094, 1096–97 (9th Cir. 1982) (testimony about defendant's description during a camping trip of a distinctive fire-starting device later used in an arson was admissible to prove the identity of the arsonist).

The district court's finding of identity is based on Smalls's verbalized intent to use asthma as an explanation for a victim's anticipated death on two separate occasions within a five-month span. Although the circumstances, outcomes, and motivations of Smalls's two crimes were different, they contained a certain distinctive and shared signature quality—Smalls's professed willingness to use the victim's asthma to explain a death for which he was (or would have been) responsible. A plan to use asthma as an excuse to cover up a victim's true cause of death is sufficiently "unusual and distinctive" to constitute a signature quality.

Smalls also argues that even if the intended use of asthma as a cover-up can by itself constitute signature quality evidence, the fact that Gantz was ultimately strangled, and not suffocated, means Smalls's statement to his wife was unrelated to the murder. But this fact does not render the evidence improper under Rule 404(b). Evidence introduced at trial showed that Smalls, Cook, and Melgar planned to suffocate Gantz and use the victim's asthma as a way to cover up their crime. Smalls expressed precisely the same idea during the altercation with his

-13-

wife, which tends to show similar plans of action. That Gantz's murder did not go according to plan does not render the evidence improper for Rule 404(b) purposes.

Smalls's prior conviction and his wife's testimony were admitted for a proper purpose under Rule 404(b) and the district court limited the admissible information to avoid unfair prejudice.[5] The court did not abuse its discretion in admitting this evidence.

## 2. Prior Felony Convictions Under Rule 609(a)(1)

In a pre-trial order, the district court allowed the admission of Smalls's 2005 felony convictions as impeachment evidence if Smalls testified at trial. He was convicted pursuant to two guilty pleas related to the altercation with his wife.[6] The court determined that the evidence was admissible because the convictions occurred within the previous ten years, the prior convictions and current charges were sufficiently dissimilar to limit the risk of the jury using the prior convictions as evidence of Smalls's propensity to commit the charged

---

[5] Smalls is correct that this evidence does not constitute evidence of a common plan under Rule 404(b). Plan evidence is offered to show that the crime for which the defendant is accused is actually part of a pre-arranged plan or scheme. *See, e.g.*, *United States v. Roberts*, 88 F.3d 872, 880–81 (10th Cir. 1996). The domestic violence episode and Gantz's murder were not related to a common scheme. Smalls's plan to invoke the same cover-up in each crime is more accurately characterized as identity evidence rather than plan evidence.

[6] As stated previously, Smalls was convicted of Aggravated Battery Against a Household Member with a Deadly Weapon and Criminal Sexual Penetration in connection with the altercation with his wife.

crimes, and Smalls's credibility would be a central issue for the jury in the event Smalls testifies. The district court also acknowledged the inflammatory nature of the prior crimes but nevertheless concluded that the names and nature of the crimes could come in without additional detail.

When the defendant is a witness in his own trial, the prosecution may introduce evidence of the defendant's past felony conviction to attack his character for truthfulness "if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." Fed. R. Evid. 609(a)(1). This "special balancing test" is used because "the defendant faces a unique risk of prejudice—*i.e.*, the danger that convictions that would be excluded under [Rule 404] will be misused by a jury as propensity evidence despite their introduction solely for impeachment purposes." Fed. R. Evid. 609, advisory committee's notes (1990 Amendments).

In the context of Rule 609(a)(1), courts have identified the following five factors for consideration: (1) the impeachment value of the defendant's prior crimes; (2) the dates of the convictions and the defendant's subsequent history; (3) the similarity between the past crime and charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the defendant's credibility at trial. *See* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 609.05[3][a] (Joseph M. McLaughlin, ed., Matthew Bender, 2d ed. 2013).

-15-

Smalls does not contest the admission of the fact that he had two prior felony convictions. He argues only that the district court abused its discretion in admitting the names and nature of the prior convictions without a special finding that the probative value of the names of the convictions outweighed their obviously prejudicial nature. Smalls cites *United States v. Yazzie*, 188 F.3d 1178 (10th Cir. 1999), for the proposition that a court may limit Rule 609 evidence under Rule 403 to the mere fact of a felony conviction when the prejudice of the other information is too great.

*Yazzie* does not help Smalls because the case did not involve a witness at trial. The defendant in *Yazzie* sought to introduce evidence of the murdered victim's past felonies to impeach the credibility of the *victim's* out-of-court statement introduced through a witness at trial. We held that the district court did not err in refusing to introduce this evidence on Rule 403 grounds. But because the source of the out-of-court statements was not a witness at trial, "[t]here was no testimony . . . subject to impeachment" that would implicate Rule 609. *Yazzie*, 188 F.3d at 1191.

The well-settled rule in this circuit is that the permissible scope of cross-examination under Rule 609 extends to the essential facts of convictions, the nature of the crimes, and the punishment. *See United States v. Commanche*, 577 F.3d 1261, 1270–71 (10th Cir. 2009) (quoting *United States v. Wolf*, 561 F.2d 1376, 1381 (10th Cir. 1977)). Indeed, the failure to include the names and nature

-16-

of prior offenses may prejudice the defendant because the jury is left to speculate as to the essential facts of prior convictions. *See United States v. Burston*, 159 F.3d 1328, 1335 (11th Cir. 1998) ("The implicit assumption of Rule 609 is that prior felony convictions have probative value. Their probative value, however, necessarily varies with their nature and number."). The district court admitted only presumptively admissible information about Smalls's prior convictions and properly determined that they were dissimilar enough from the murder charge such that a jury would not convict Smalls on the basis of propensity reasoning.

We find no abuse of discretion in the district court's decision.

### 3. Co-Conspirator Statements Under Rule 801(d)(2)(E)

Smalls next argues the district court erred in admitting out-of-court statements made by Melgar because the district court wrongly concluded that Smalls was a member of the conspiracy to kill Gantz. But the pre-trial ruling on the co-conspirator issue addressed only whether Smalls and Cook were co-conspirators.

A statement made by a co-conspirator "during the course and in furtherance of the conspiracy" is not hearsay. Fed. R. Evid. 801(d)(2)(E). To admit a co-conspirator's statements, the district court must find: "(1) by a preponderance of the evidence, a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course

-17-

of and in furtherance of the conspiracy." *United States v. Patterson*, 713 F.3d 1237, 1245 (10th Cir. 2013).

At the time of the *James*[7] hearing on this issue and the district court's order, Melgar had reached a plea agreement with the government, but Cook had not. The government intended to offer co-conspirator statements against Smalls and Cook through Melgar's testimony. Consequently, there was never an objection or a ruling on whether Melgar's out-of-court statements were admissible under the co-conspirator rule. The only example of an introduction of Melgar's out-of-court statements that we can find in the record is Melgar's videotaped testimony to the FBI.[8] Smalls did not object to the admission of the video at trial; in fact, he introduced it as impeachment evidence against Melgar immediately after Melgar testified. Although Smalls may have an argument that the video should not have been introduced under the co-conspirator rule, he cannot attack evidence that he brought in to impeach Melgar.

Smalls also suggests that the court erred in permitting Melgar to testify as to out-of-court statements made by Smalls under the co-conspirator rule. But such statements are not hearsay because they are statements of a party opponent and do not implicate the co-conspirator rule. Fed. R. Evid. 801(d)(2)(A).

---

[7] *United States v. James*, 590 F.2d 575 (5th Cir. 1979).

[8] Melgar's attorney also testified to out-of-court statements made by Melgar, but these statements were admitted as prior consistent statements under Rule 801(d)(1)(B).

### 4. *Prior Consistent Statements Under Rule 801(d)(1)(B)*

Smalls argues against the admission of certain out-of-court statements made by Cook and Melgar under the prior-consistent-statement rule.

A statement is not hearsay if the declarant testifies and is subject to cross-examination about a prior statement when the statement "is consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d)(1)(B); *see also Tome v. United States*, 513 U.S. 150, 167 (1995) ("The Rule permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive."). These statements are admitted as substantive evidence, not just to rebut an attack on the witness's credibility. *Id.* at 157.

Under our precedent, a declarant has a motive to lie as soon as he is arrested. *United States v. Moreno*, 94 F.3d 1453, 1455 (10th Cir. 1996); *see also United States v. Powell*, 220 F. App'x 805, 812 (10th Cir. 2007) (unpublished) ("Gabriel Davis's prior consistent statements followed his arrest, however, meaning that, according to the logic of our precedent, the statements came after Mr. Davis had acquired a motive to lie.") (emphasis omitted). But we have also found that an improper motive may arise even before the declarant's arrest. For example, in *United States v. Albers*, we held that the pre-motive requirement was

not met when a declarant made the prior statement to an investigator only after he had become afraid that his co-conspirators would testify against him. 93 F.3d 1469, 1482–83 (10th Cir. 1996).

The district court admitted Cook's recorded statement to fellow inmate, Larry Green, in which Cook described the three defendants' roles in Gantz's murder. Cook made this statement to Green following news that federal authorities were investigating Gantz's death as a homicide. The court found that Cook had no motive to lie because he was not charged for another year and his plea bargain was not made for another five years. Smalls argues that the motive to lie had arisen by the time Cook made the statement because Gantz's death was being investigated as a homicide and Cook needed a story to minimize his role and have someone against whom to cooperate. Although the latter assertion is pure speculation, the fact is that Cook was unaware that he was in the presence of a government agent. Cook could not have been motivated to curry favor with the government because Cook was unaware that the government was recording him. The district court did not abuse its discretion in admitting the recorded statements.

Smalls also argues that for a prior consistent statement to be admissible under the Confrontation Clause, it must meet pre-*Crawford*[9] standards of reliability. But the "Confrontation Clause has no application to [nontestimonial]

---

[9] *Crawford v. Washington*, 541 U.S. 36 (2004).

statements and therefore permits their admission even if they lack indicia of reliability." *Whorton v. Bockting*, 549 U.S. 406, 420 (2007); *see also United States v. Smalls*, 605 F.3d 765, 780 (10th Cir. 2010) ("[T]he only question pertinent to the admissibility of a nontestimonial statement is whether it meets the requirements of the Federal Rules of Evidence."). We previously held that Cook's statement was nontestimonial, *see id.* at 778, and thus the Confrontation Clause does not apply.

The district court admitted a statement made by Melgar to his attorney that implicated the three cellmates in Gantz's murder. The statement was made while Melgar was being held for illegal reentry into the United States and after his attorney informed Melgar that the United States was interested in debriefing about Gantz's murder. The district court held that the statement was made before any motive to fabricate arose because it was made in the context of the attorney-client relationship in an unrelated case, prior to debriefing with the FBI, and well before Melgar was charged with Gantz's murder. In opposition, Smalls argues that the motive to fabricate arose before Melgar made the statement to his attorney. Melgar made the statement only after being told of the government's interest in debriefing. Smalls argues that Melgar's attorney had informed Melgar that the government was seeking his cooperation and was advised of the potential benefits to him. Melgar was thus motivated to tell a "good story" and his attorney was the "test audience." Aplt. Br. at 21.

The Second Circuit has allowed prior consistent statements made to a declarant's attorney after the attorney informed him of a co-conspirator's probable cooperation with the government. In *United States v. Caracappa*, 614 F.3d 30 (2d Cir. 2010), the defendant argued that the declarant's motive to lie arose immediately upon an accomplice's arrest and thus a statement the declarant subsequently made to his attorney was inadmissible as a prior consistent statement. The district court had reasoned in *Caracappa* that for the defendant's theory to hold, the declarant "must have believed in 1994 that he would eventually cooperate with the government, hoping that his testimony against the defendants would be called into question and knowing that if he told [his attorney] of his involvement, his account would have increased merit." *Id.* at 40. This, the court held, was far-fetched.

Smalls essentially makes the same argument. According to Smalls's theory, Melgar would have had to make an on-the-spot decision to fabricate a story to his attorney so that his version of events would have increased merit in future proceedings. We also find this argument speculative and far-fetched.

The district court did not abuse its discretion in admitting Melgar's prior statement.

### 5. *Video Surveillance, Still Photos, and Accompanying Testimony*

Investigators discovered video footage from December 25, 2004 that showed Smalls walking through the medical unit and stopping to speak with an

inmate outside his cell. Cook testified that the same inmate had previously told him Gantz was a government informant. The footage showed Smalls making several gestures, including clenching his fists and pointing to his neck. Smalls also slid a bag under the door. Three days later, he spent ten minutes with the same inmate in the recreation yard.

Video surveillance, still photos, and testimony regarding Smalls's interactions with the inmate outside the inmate's cell were admitted without objection, so their admission is reviewed for plain error. The district court originally denied the government's motion to admit the video footage of Smalls interacting with the inmate because the videos were not available for viewing at that time, but the denial of the motion was subject to reconsideration in the event of an additional hearing. During trial, still photos of Smalls at the inmate's cell were introduced without objection. Upon the district court's *sua sponte* raising of the Best Evidence Rule, Fed. R. Evid. 1002, Smalls withdrew his objection to playing the video surveillance footage, which was shown to the jury.

On appeal, Smalls advances several arguments against the admission of this evidence. First, he argues he was prejudiced by the misleading presentation of the evidence. The still photos amounted to "editorialized" evidence, where the witness, a government agent, described what she believed the still photos showed. Aplt. Br. at 38. And the video format, which displayed images that were captured in six-second intervals and in fast-forward speed, prejudiced Smalls because his

movements appeared violent and jerky. Smalls also argues that the evidence was irrelevant and the government's descriptions of it speculative. In its closing argument, the government had asserted that Smalls's movements were descriptions to the inmate of how the conspirators would murder Gantz.

As to his first argument, the admission of "editorialized" still photos was not plain error because it did not prejudice Smalls. During her testimony, the government agent described Smalls in one still photo as pressing his clenched fists downward and, in another photo, gesturing toward his neck. Smalls points to a district court case in which the court prohibited admission of selected portions of a chat room conversation because the "cut-and-paste" document did "not accurately represent the entire conversations that took place between the defendant and [the victim]." *United States v. Jackson*, 488 F. Supp. 2d 866, 871 (D. Neb. 2007). But the district court here cured any prejudice that could have occurred through the admission of still photos derived from video surveillance and the agent's commentary. The court raised the Best Evidence Rule, and Smalls removed his objection to showing the video surveillance footage. Thus, the jury was able to see the video free from editing and commentary.

The admission of the video surveillance footage was likewise not plainly erroneous. Smalls makes no argument besides speculating that the video's format, which made Smalls's movements appear violent and jerky, prejudiced the jury. This unsupported assertion is not sufficient to establish error, let alone plain

-24-

error. And any prejudice to Smalls was minimized when a witness explained how the prison's video surveillance system captures and displays images in such a way as to present Smalls's movements in six-second intervals.

Smalls also alleges that the evidence pertaining to his interaction with the inmate was irrelevant. The government argues that because Smalls asserted in his opening statement that the inmate told Cook about Gantz being an informant, Smalls made these interactions relevant to combat the defense's theory that only Cook had a motive to kill Gantz. Smalls responds that it was the government that expressed before trial its intent to make the inmate an issue in the case.

Regardless of whether the evidence was introduced to attack the defendant's theory of the case or simply as evidence of Smalls's involvement in the planning of the murder, it is clearly relevant. Cook testified that the inmate had told him about the hit on Gantz. Smalls's conversation with the source of this information is relevant to establishing that Smalls was aware of the hit and thus may have had a motive to participate.

Smalls also argues the government, in its closing arguments, improperly speculated that Smalls's actions at the inmate's cell indicated that he was describing the murder to the inmate. Whether a statement constitutes improper speculation, however, is a narrower inquiry than Smalls suggests. *See Thornburg v. Mullin*, 422 F.3d 1113, 1134 (10th Cir. 2005) ("A prosecutor is allowed to comment on the evidence and draw inferences therefrom, but he may not

-25-

speculate or refer to evidence never presented to the jury."). The government never speculated or referred to evidence not presented to the jury. The government properly presented evidence of Smalls talking with the inmate in the days leading up to the murder and offered reasonable inferences as to the meaning of his gestures.

In sum, the district court did not err in admitting the evidence.

## B. *Prosecutorial Misconduct*

Smalls next argues that the government knowingly solicited false testimony from Melgar and Cook. He alleges that Cook and Melgar's testimony that they used a bag to suffocate Gantz contradicted the uncontroverted medical evidence that Gantz was strangled. The government was aware of this information, yet allowed the two witnesses to testify without correction and a government agent to corroborate their testimony. Smalls also argues that the government improperly vouched for Melgar in its opening and closing statements by arguing that his testimony was reliable because Cook had corroborated it.

"A conviction obtained by the introduction of perjured testimony violates due process if (1) the prosecution knowingly solicited the perjured testimony or (2) the prosecution failed to correct testimony it knew was perjured." *United States v. Vaziri*, 164 F.3d 556, 563 (10th Cir. 1999). The appellant bears the burden of establishing the presentation of false evidence. *Smith v. Gibson*, 197 F.3d 454, 458 (10th Cir. 1999).

The government did not elicit false testimony. The government, of course, recognized that Gantz died as a result of strangulation. But the purpose of Melgar and Cook's testimony was to support their theory that the conspirators intended to suffocate Gantz and ended up strangling him instead. There was expert testimony that the results of the autopsy were consistent with Melgar and Cook's testimony —that Melgar placed the plastic bag over Gantz's head and then pushed down with his clenched fists. That Melgar continued to believe he did not touch Gantz's neck does not render the testimony false. He may not recollect whether he touched Gantz's neck or may be convinced he did not. Regardless, this is an issue of credibility for the jury and is not definitively false testimony. And the government agent's testimony simply confirms that Cook and Melgar believed that they suffocated Gantz before they were arrested and charged.

The government did not engage in impermissible vouching. The prosecution engages in impermissible vouching "only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." *United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir. 1990). In this case, the prosecutor asked the jury to credit Melgar's testimony on the basis of Cook's corroborating testimony, which was before the jury to consider. The prosecutor did not make personal assurances of the veracity of

either witness or suggest that he had information not before the jury to support the testimony.

## C. Jury Instructions

Smalls challenges the district court's decisions regarding four jury instructions. He argues the district court abused its discretion in declining to adopt instructions that (1) Smalls's mere presence in the cell was not evidence of guilt, (2) the truthfulness provisions in Cook and Melgar's plea agreements did not verify the truth of their testimony, and (3) testimony by co-conspirators should be weighed with greater care than other testimony. He also argues the court plainly erred in failing to give a curative instruction for the government's vouching of Cook and Melgar's testimony.

We review the decision to give or refuse a particular jury instruction for abuse of discretion. *United States v. Bedford*, 536 F.3d 1148, 1152 (10th Cir. 2008). But where a party does not object to the inclusion or exclusion of a particular instruction, we review for plain error. *United States v. Romero*, 491 F.3d 1173, 1178 (10th Cir. 2007).

### 1. Presence in Cell

The court declined to instruct the jury that Smalls's mere presence in the cell was not evidence of guilt. It denied the instruction because the court gave the instruction that mere knowledge is not enough for a conspiracy and that mere presence is not enough for aiding and abetting liability, which were contained in

the instructions for three separate counts. Smalls argues that a stand-alone mere presence instruction was necessary because instructing the jury on mere knowledge and mere presence in connection with only three counts implied that it may consider mere presence in connection with the other two counts.

The district court did not abuse its discretion in declining to adopt a mere presence instruction. "It is not error to refuse to give a requested instruction if the same subject matter is adequately covered" elsewhere. *United States v. Miller*, 460 F.2d 582, 588 (10th Cir. 1972). In each of the counts, the jury was instructed that conviction required agreement or knowing conduct or both. No stand-alone mere presence instruction was necessary as the jury was explicitly instructed of the requirement that Smalls have some active involvement in the conspiracy or the act. That the mere presence instruction was given in other counts does not alter this conclusion. A mere presence instruction simply emphasizes the active involvement requirement to the jury. Failure to give the instruction on some counts does not transform the express meaning of "agreement" or "knowing conduct" and thus would not confuse the ordinary juror.

### 2. Truthfulness

The district court also declined to instruct the jury that the government had no greater ability to verify Cook and Melgar's truthfulness than the jury. Smalls argues this curative instruction was necessary because the truthfulness provisions in Cook and Melgar's plea agreements—which conditioned the receipt of certain

government benefits on a finding that they testified truthfully— were entered into evidence and thus had the effect of vouching for the witnesses' truthfulness. He cites to *United States v. Harlow*, 444 F.3d 1255, 1265 (10th Cir. 2006), in which we held that to the extent that any impermissible vouching occurred by the admission of plea agreements with truthfulness provisions, the district court's credibility instructions cured any error.

*Harlow* is distinguishable. We held in *Harlow* that submission of the witnesses' plea agreements, which also contained provisions conditioning government benefits on a finding of truthful testimony, was erroneous because they were submitted "in conjunction with the evidence that the prosecutor moved for the benefits thereunder and the judge issued his approval." *Id.* at 1262. It was the additional evidence of the government's finding that the testimony was truthful, not the truthfulness provisions on their own, that had the effect of improper government vouching. Here, by contrast, the government introduced only the plea agreements, which does not constitute improper vouching. *See United States v. Claycomb*, 372 F. App'x 832, 840 (10th Cir. 2010) ("[I]t is permissible for a prosecutor to introduce a witness's plea agreement including a truthfulness provision and to discuss that provision to make sure the witness is aware of the consequences of failing to tell the truth and for the purpose of heading off any claim the witness's testimony is suspect because of the plea agreement.").

-30-

The district court did not abuse its discretion in declining to issue a credibility instruction.

### 3. Weighing Testimony

Smalls also argues the district court abused its discretion in declining to give an instruction on the care required to weigh the testimony of Melgar and Cook. Smalls had asked the district court to instruct the jury that Melgar and Cook's testimony should be weighed with greater care than the testimony of a witness who did not commit a crime. Contrary to Smalls's assertions, the district court did give an instruction that the jury should "receive this type of testimony with caution and weigh it with great care," as well as other instructions emphasizing this notion. Supp. R., Vol. IV at 323. The district court did not abuse its discretion in declining to use the precise language from Smalls's proposed instruction.

### 4. Curative Instruction for Vouching

Finally, Smalls argues the district court plainly erred in failing to give a curative instruction for the government's alleged improper vouching of Cook and Melgar's testimony. Smalls acknowledges that improper vouching can be cured by an appropriate instruction. *See Harlow*, 444 F.3d at 1265. But the government did not improperly vouch for any testimony because it did not make "personal assurances of the witness' veracity" or "implicitly indicat[e] that information not

presented to the jury supports the witness' testimony." *Bowie*, 892 F.2d at 1498. Thus, a curative instruction was not necessary.

### D. Sufficiency of the Evidence

Whether there is sufficient evidence to support a conviction is a legal question that is reviewed de novo. *United States v. Hasan*, 609 F.3d 1121, 1132 (10th Cir. 2010). We view the evidence in the light most favorable to the government and must draw all reasonable inferences in favor of the government. *United States v. King*, 632 F.3d 646, 650 (10th Cir. 2011). It is not our job to "weigh conflicting evidence or consider witness credibility, as that duty is delegated exclusively to the jury." *United States v. Hien Van Tieu*, 279 F.3d 917, 921 (10th Cir. 2002).

Smalls was convicted of five federal offenses: retaliation against a government witness or informant, conspiracy to retaliate, tampering with a government witness or informant, conspiracy to tamper, and killing an assistant in a federal investigation. Smalls argues that the government presented insufficient evidence to sustain his convictions. Specifically, he contends there was insufficient evidence of his participation in Gantz's murder and of the specific intent required by the statutes. He also argues that the government did not establish it was reasonably likely that, had Gantz communicated with a law enforcement officer, it would have been a federal officer. Because the

government presented sufficient evidence to sustain the convictions, we affirm the judgment of the district court.

### 1. Participation in the Murder

Smalls first argues that the jury had insufficient evidence to establish he participated in Gantz's murder. According to Smalls, no reasonable juror could find that the murder happened as Melgar described because Melgar's testimony that he suffocated Gantz contradicted the medical evidence that Gantz died by strangulation. Further, Cook was unable to articulate his precise role in the murder and it remained unanswered how Smalls restrained Gantz's feet.

Each of these points concerns how the jury resolved conflicting testimony, which is not within the scope of our review and is exclusively a jury function. The government presented sufficient evidence that Smalls participated in the murder: his cellmates testified that all three individuals participated in the murder and an expert opined that the lack of defensive wounds on Gantz's body was consistent with being restrained.

### 2. Intent to Retaliate

A defendant is guilty of retaliating against a witness if he knowingly kills a person with intent to retaliate against that person for being a witness at an official proceeding or "for providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1513(a)(1)(A), (B). A defendant who conspires to commit the offense of

retaliation is subject to the same penalties. § 1513(f). "[T]he government need not adduce direct evidence of Appellant's knowledge of a witness's informant status in order for the jury to infer his intent to retaliate." *United States v. Ashley*, 606 F.3d 135, 140 (4th Cir. 2010) (internal quotation marks omitted).

Smalls argues that there was insufficient evidence presented to sustain his convictions for retaliation and conspiracy to retaliate because the government did not introduce evidence of intent to retaliate. No witness testified as to Smalls's intent to retaliate against Gantz for his cooperation as a federal informant. To reach this conclusion, Smalls maintains, the jury had to infer that Smalls was connected to drug traffickers or had a particular dislike of informants, which the evidence did not establish. While a jury may have inferred that Smalls acted in expectation of a reward payment for a hit on Gantz, there was no evidence that he acted out of a hatred of informants or to satisfy drug traffickers. To make such a finding, says Smalls, the jury would have had to impermissibly pile "inference upon inference." *United States v. Summers*, 414 F.3d 1287, 1294 (10th Cir. 2005).

The government points to three pieces of evidence as support for the verdict: (1) Melgar testified that Smalls told him Gantz was a "rat" and had provided information about others in a federal case, R., Vol. V at 619; (2) Melgar testified that Smalls had told him that a letter about Gantz had been passed around prison and said Gantz was to be killed because he's a rat, *id.* at 643–44, 647–48;

-34-

and (3) Cook testified that Smalls told him Gantz was cooperating with the government, others wanted him dead, and there was a hit on him, *id.* at 1094–95, 1098. Melgar also testified that Smalls encouraged him to participate based on Gantz's past cooperation that resulted in the capture of four "Michoacanos," who Smalls described as Melgar's "people." *Id.* at 648.

The evidence allows for a reasonable inference that Smalls killed Gantz in retaliation for Gantz's previous cooperation with the government. The fact that Smalls discussed Gantz's cooperation with the government in the murder's planning stages is enough to infer that Gantz's cooperation was a substantial motive in the murder. Based on Smalls's knowledge and discussion of Gantz's cooperation, his pressure on Melgar to participate based on Gantz's previous cooperating activities, and his knowledge of the hit on Gantz, a reasonable juror could infer an intent to retaliate. Smalls's theory that it was more likely that he committed the murder for his own monetary benefit is not inconsistent with being motivated by an intent to retaliate. In *Ashley*, the court upheld a defendant's conviction under § 1513 where the defendant was paid for his attempt to have an informant killed in retaliation for giving information to law enforcement about a fellow inmate. *Ashley*, 606 F.3d at 139–40. Smalls's ultimate purpose may have been to collect a reward for killing Gantz, but the purpose of the bounty was to encourage a retaliatory attack.

### 3. *Intent to Tamper*

A defendant is guilty of tampering with a witness if he knowingly kills another person with intent to "prevent the attendance or testimony of any person in an official proceeding" or "prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense."  18 U.S.C. § 1512(a)(1)(A), (C).  A defendant who conspires to commit the offense of tampering is subject to the same penalties.  § 1512(k).  "To sustain a conviction under [§ 1512] the government does not need to prove the defendant knew of the existence of an ongoing official proceeding."  *United States v. Ahrensfield*, 698 F.3d 1310, 1324 (10th Cir. 2012) (citing § 1512(c)(2)).  Rather, "a conviction is proper under the statute if interference with the official proceeding is the 'natural and probable effect' of the defendant's conduct."  *United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009) (quoting *United States v. Aguilar*, 515 U.S. 593, 601 (1995)).[10]

---

[10]  In *Aguilar*, the Supreme Court addressed the intent element under 18 U.S.C. § 1503(a), which criminalizes "corruptly endeavor[ing] to influence, obstruct, or impede" the due administration of justice.  The Court announced the "natural and probable effect" test (or the "nexus" requirement) as the correct approach to determining whether a defendant acts with the requisite intent under the statute.  *Aguilar*, 515 U.S. at 601.  In *Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005), the Court applied this test to the intent element under 18 U.S.C. § 1512(b), which prohibits knowingly and corruptly persuading another person to withhold documents in an official proceeding.  Based on the similar language of §§ 1503(a) and 1512(c)(2), and the Supreme Court's application of the *Aguilar* test to another section of § 1512, we held the "natural and probable effect" test applies to § 1512(c)(2).  *Phillips*,  583 F.3d at 1264.  For substantially

(continued...)

Smalls argues that there was insufficient evidence to establish the requisite specific intent. The only evidence that Gantz was still assisting federal investigators was that he was a potential witness in the government's case against a reneging cooperator. And Gantz had last provided information to the government nearly a year before the murder; thus, an inference of intent to hinder attendance or communication cannot be reasonably derived from these circumstances.

But the government introduced sufficient evidence for a jury to infer that interference was the "natural and probable effect" of Smalls's conduct. Smalls was aware that Gantz had cooperated with federal authorities in the past and manifested a belief that Gantz was still cooperating.[11] Gantz also was, at the time of the murder, a potential witness in the upcoming trial of the reneging government cooperator. Even if Smalls was not specifically aware of this information, preventing a witness's testimony in a federal proceeding is a natural and probable effect of killing a known government informant. *See Ashley*, 606 F.3d at 140 ("We are mindful that retaliation against informants and witness tampering are distinct offenses. While the difference between them should not be

_____

[10](...continued)
the same reasons we described in *Phillips*, the *Aguilar* test is the correct approach to determining whether the defendant acted with the requisite intent under § 1512(a)(1)(A) and (C).

[11] Cook testified that Smalls said, "Gantz was cooperating with the federal authorities or whatever." R., Vol. V at 1098.

blurred, the two offenses are often related.  Providing information and serving as a witness often go hand-in-hand, and the proof used to support a conviction on one offense will frequently underlie a conviction on another, notwithstanding the differences between the two statutes.").

Viewed in a light most favorable to the government, a reasonable juror could infer from this evidence that Smalls killed Gantz to prevent him from testifying in a federal proceeding.[12]

### 4.  *Communication with Federal Law Enforcement Authorities*

Finally, Smalls contends that there was insufficient evidence to show that Gantz would have had a future relevant communication with federal law enforcement.  He points to a recent Supreme Court case, *Fowler v. United States*, 131 S. Ct. 2045 (2011), to support his claim that there was insufficient evidence to sustain his conviction under the federal witness tampering statute.  The Court in that case held the government must show a "reasonable likelihood" that had the victim communicated with a law enforcement official, at least one relevant communication would have been made to a *federal* official.  *Id.* at 2052.  The Court stressed that the government "need not show that such a communication, had it occurred, would have been federal beyond a reasonable doubt, nor even that

---

[12]  Smalls offers the same intent argument to challenge his conviction of killing Gantz for aiding a federal investigation in violation of 18 U.S.C. § 1121(a)(2).  But, as with the retaliation and tampering counts, the government introduced sufficient evidence that Smalls was motivated by Gantz's assistance in a federal investigation, which was ongoing at the time of Gantz's murder.

it is more likely than not." *Id.* But it "must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.*

The government submitted enough evidence from which a jury could infer that it was reasonably likely that had Gantz communicated with a law enforcement officer, he would have communicated with a federal officer. Gantz was cooperating with the FBI, had debriefed twice with the FBI regarding drug trafficking in Roswell, pleaded guilty to a plea agreement with cooperation language, and was a potential witness in a future trial of a reneging cooperator in a federal investigation. Melgar also testified that Gantz was giving out information about other people in a federal case.

Because there was sufficient evidence that Smalls killed Gantz to prevent his communication with a law enforcement officer, and it was reasonably likely that this communication would have been to a federal officer, there is sufficient evidence to sustain his conviction under § 1512.

### E. Cumulative Error

A cumulative error analysis evaluates "only the effect of matters determined to be error, not the cumulative effect of non-errors." *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) (en banc). Because the district court did not commit error, there is no need to conduct a cumulative error analysis.

-39-

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

The appellee's motion to supplement the record is GRANTED.